UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MICHAEL BOHLINGER,
                            Plaintiff,

-v-

ABBOTT LABORATORIES INC.,
                            Defendant.

18-CV-5398 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Michael Bohlinger brings this suit for age discrimination against Abbott Laboratories Inc. under New York City's Human Rights Law. Abbott has moved for summary judgment. For the reasons that follow, the motion is granted.

**I.    Background**

For purposes of this motion for summary judgment, the following facts are presented in the light most favorable to Bohlinger, the nonmovant.

Defendant Abbott Laboratories Inc. develops, manufactures, and sells health care products. (Dkt. No. 1 ("Compl.") ¶ 4.) Plaintiff Michael Bohlinger worked for Abbott as a sales representative for forty-three years. (*See* Dkt. No. 39 ("SOF") ¶¶ 3–4.) From 2015 to 2018, Bohlinger was a pediatric sales representative responsible for territory covering parts of Brooklyn and Queens. (SOF ¶ 6.) As a pediatric sales representative, Bohlinger was responsible for marketing and selling Abbott's pediatric products to hospitals and doctor's offices. (Dkt. No. 40 ("PSAF") ¶ 6.)

Prior to 2015, pediatric sales representatives were largely considered generalists, with representatives calling on both hospitals and doctor's offices. (SOF ¶ 22.) In 2015, Abbott undertook a nationwide specialization of its pediatric sales representatives, categorizing them

1

into three roles. (SOF ¶¶ 33, 35.) Hospital Sales Specialists ("HSSs") would call on hospitals, Office Sales Specialists ("OSSs") would call on offices, and Pediatric Sales Specialists ("PSSs") would call on both hospitals and offices. (SOF ¶ 35.) Bohlinger was categorized as a PSS — a decision made by Peter Youngs, the Regional Sales Director at the time, in consultation with Bohlinger's immediate supervisor at the time, Susan Schultz. (SOF ¶¶ 7, 39, 41.)

Each representative's territory is associated with an estimated "workload." Abbott has a target workload for each territory of 800 to 1,400 hours per year. (SOF ¶ 61.) Each territory's workload depends on the number of accounts (*i.e.*, hospitals or offices) in the territory, the annual number of births per account, and the representative's ability to access each account. (SOF ¶ 62.) To that end, Abbott assigns each account to a "decile" according to the number of annual births at that account for which the babies receive nonsubsidized formula. (PSAF ¶ 15.) The higher the number of such births, the higher the decile, and the higher the estimated workload associated with that account. (*Id.*)

As part of the 2015 specialization, Abbott adjusted the metes and bounds of the representatives' territories. Bohlinger met with Schultz, his immediate supervisor at the time, who explained to Bohlinger how his territory would be affected. (PSAF ¶ 19.) In particular, two of Bohlinger's highest-decile hospitals were transitioned to another representative. (PSAF ¶ 27.) Overall, compared with the other representatives, Bohlinger was assigned a territory with the lowest workload but the highest number of accounts. (PSAF ¶¶ 26–27, 29–30.) At the time, Bohlinger was 68 years old, the oldest sales representative in his district. (PSAF ¶ 4.) During the meeting with Schultz, Schultz asked Bohlinger "how much longer [he was] going to be around." (SOF ¶ 56.)

By 2017, due to an across-the-board decrease in workload in the district, Bohlinger's territory fell below Abbott's target workload of 800 hours per year. (SOF ¶ 66.) By this point, Bohlinger's immediate supervisor was Eric Brown, and the Regional Sales Director was Zariq Siddiqui. (SOF ¶¶ 9, 11.) Brown met with Siddiqui to discuss a potential "realignment." (SOF ¶ 59; PSAF ¶ 37.) One possible solution was to reassign Bohlinger to an open territory in New Jersey, where Bohlinger lived. (SOF ¶¶ 69–70.) It was determined that Brown would ask Bohlinger if he would be interested in transferring to that territory. (*Id.*)

Brown spoke with Bohlinger and informed him that his territory was "no longer viable" and "wouldn't be there" moving forward. (PSAF ¶ 50.) Brown informed Bohlinger of the New Jersey territory and asked if he would be willing to accept a transfer. (SOF ¶¶ 70–71.) Bohlinger considered the transfer but ultimately refused it for being unrealistic and impracticable. (SOF ¶¶ 69, 72.) Accordingly, Bohlinger retired. (*Id.*; PSAF ¶ 63.)

In 2018, Bohlinger commenced suit against Abbott for age discrimination. Bohlinger brings a single claim under the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.*[1] Abbott has moved for summary judgment.

**II.    Legal Standard**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A fact is material if it "might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the nonmoving party, *Ricci v. DeStefano*, 557 U.S.

---

[1] This Court has subject-matter jurisdiction under 28 U.S.C. § 1332. Bohlinger is a citizen of New Jersey, while Abbott is a citizen of Delaware and Illinois. The matter in controversy exceeds $75,000 exclusive of interest and costs.

557, 586 (2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The court should view all evidence "in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (citation omitted). But the nonmoving party cannot rely upon mere "conclusory statements, conjecture, or speculation" to meet its burden. *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (citing *Matsushita*, 475 U.S. at 587).

### III.     Discussion

Abbott advances several arguments in support of its motion for summary judgment. Each is discussed in turn.

#### A.     Timeliness of Bohlinger's 2015 Claims

Bohlinger filed this suit on June 14, 2018. (*See* Compl.) The City's Human Rights Law imposes a three-year statute of limitations. *See* N.Y.C. Admin. Code § 8-502(d). Accordingly, any claims that accrued before June 14, 2015 — including any claims arising out of Bohlinger's classification as a PSS during the Spring 2015 specialization (SOF ¶¶ 33, 49, 51–53) — are time barred, absent an applicable exception.

Bohlinger does not contest that the 2015 conduct falls outside the three-year limitations period. (Dkt. No. 36 at 8–9.) But he argues that an exception — the "continuing-violation" doctrine — saves his claims. That doctrine "extends the limitations period for all claims of discriminatory acts committed under [an ongoing policy of discrimination] even if those acts, standing alone, would have been barred by the statute of limitations." *Annis v. Cty. of Westchester*, 136 F.3d 239, 245–46 (2d Cir. 1998) (alteration in original) (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997)). To qualify, a plaintiff must show either "an ongoing policy of discrimination" by the employer or "related instances of discrimination [that] [we]re permitted by the employer to continue unremedied for so long as to

4

amount to a discriminatory policy or practice." *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001) (first quoting *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir. 1993); and then quoting *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir. 1994)).[2]

Here, Bohlinger asserts, in conclusory fashion, that Abbott's 2015 conduct and 2017 conduct are sufficiently "linked" to constitute a single act of discrimination. (Dkt. No. 36 at 9.) But Bohlinger fails to identify any specific evidence that the 2015 and 2017 conduct are "related closely enough" to trigger the exception. *Fitzgerald*, 251 F.3d at 362 (quoting *Green v. L.A. Cty. Superintendent of Schs.*, 883 F.2d 1472, 1480 (9th Cir. 1989)). The 2015 decision to categorize Bohlinger as a PSS was made by his then-supervisor Youngs and then-Director Schultz (SOF ¶ 41), whereas the 2017 decision to consider reassigning Bohlinger to a new territory was made by his then-supervisor Brown and then-Director Siddiqui (PSAF ¶ 37). Bohlinger points to no evidence that these two decisions — made by different supervisors, in different contexts, more than two years apart[3] — were connected. (*See* Dkt. No. 36 at 8–9.) Thus, Bohlinger has

---

[2] Under federal antidiscrimination law, the continuing-violation doctrine is categorically inapplicable where, as here, the alleged conduct consists of a series of "[d]iscrete acts such as termination . . . [or] denial of transfer." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002). But courts in this circuit have held that under the more generous provisions of the City's Human Right's Law, the continuing-violation doctrine extends to "specific and related instances of discrimination." *Richardson v. City of New York*, 2018 WL 4682224, at *12 (S.D.N.Y. Sept. 28, 2018) (quoting *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 766 (2d Cir. 1998)).

[3] These differences preclude a finding of a continuing violation. *See Allah v. City of N.Y. Dep't of Parks & Recreation*, 47 F. App'x 45, 48 (2d Cir. 2002) (summary order) (holding that a plaintiff alleging "different types of actions that were committed by different supervisors and that bear no clear relationship to each other . . . does not allege a continuing violation"); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 766 (2d Cir. 1998) (noting that "two-year gap between discriminatory events 'negates the contention that the acts were continuous or connected'" (quoting *Selan v. Kiley*, 969 F.2d 560, 566–67 (7th Cir. 1992))); *Anderson v. Davis Polk & Wardwell LLP*, 850 F. Supp. 2d 392, 406 (S.D.N.Y. 2012) ("[E]arlier episodes [of discrimination] are plainly unrelated because they involve wholly different employees."); *Young v. Strack*, No. 05-CV-9764, 2007 WL 1575256, at *5 (S.D.N.Y. 2007) ("[D]istinct incidents 'involving different periods, circumstances, and locations' . . . cannot serve as the basis for a

"fail[ed] to connect the timely and untimely allegations in any meaningful way," which bars application of the continuing-violation doctrine. *Grimes-Jenkins v. Consol. Edison Co. of N.Y., Inc.*, No. 16-CV-4897, 2017 WL 2258374, at *9 (S.D.N.Y. May 22, 2017). The claims arising out of conduct occurring before June 14, 2015, are time barred.[4]

### B. Bohlinger's Remaining Claims

New York City's Human Rights Law prohibits employers and their agents from discharging or otherwise discriminating against an employee on the basis of the employee's "actual or perceived age." N.Y.C. Admin. Code § 8-107(1)(a). The City's Human Rights Law imposes a burden-shifting framework: "the plaintiff must establish a prima facie case, and the defendant then has the opportunity to offer legitimate reasons for its actions." *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 75–76 (2d Cir. 2015). But where a defendant moving for summary judgment "has put forward evidence of one or more nondiscriminatory motivations for its actions," a court should "avoid the unnecessary and sometimes confusing effort of going back to the question of whether a prima facie case has been made out" and "'turn to the [ultimate] question of whether the defendant has sufficiently met its burden' of establishing that 'no jury could find the defendant liable under any evidentiary route.'" *Jaquez v. N.Y.C. Health & Hosps. Corp.*, No. 14-CV-3393, 2016 WL 155279, at *9 (S.D.N.Y. Jan. 12, 2016) (alterations omitted)

---

continuing violation." (alterations omitted) (quoting *Konigsberg v. Lefevre*, 267 F. Supp. 2d 255, 263 (N.D.N.Y. 2003))); *Little v. Nat'l Broad. Co.*, 210 F. Supp. 2d 330, 368 (S.D.N.Y. 2002) (holding that "allegations involv[ing] different co-workers and supervisors, in different time periods" involved "differences [that] preclude[d] invocation of the continuing violation doctrine"); *Swanston v. Pataki*, 97-CV-9406, 1999 WL 504905, at *4 (S.D.N.Y. July 15, 1999) (denying application of continuing-violation exception because "the incidents involved different conduct by different persons in diverse contexts, and were not repetitive or ongoing in nature").

[4] Bohlinger correctly notes, however, that the 2015 conduct — including Schultz's question asking Bohlinger "how much longer [he was] going to be around" (SOF ¶ 56) — is admissible as "background evidence in support of a timely claim." *Morgan*, 536 U.S. at 113.

6

(quoting *Bennett v. Health Mgmt. Sys., Inc.*, 936 N.Y.S.2d 112, 124 (App. Div. 1st Dep't 2011)).[5]

Here, Abbott has stated a nondiscriminatory reason for its decision: in 2017, the workload for Bohlinger's territory dropped below Abbott's target threshold, which triggered concern about the territory's viability. (SOF ¶¶ 61, 65.) Accordingly, "summary judgment is appropriate if no reasonable jury could conclude either that the defendant's reasons were pretextual, or that the defendant's stated reasons were not its sole basis for taking action." *Id.* (citations and internal quotation marks omitted). In other words, summary judgment is appropriate unless Bohlinger has "put[] forward 'some evidence' that undermines, in any way, Defendant['s] rationale." *Jaquez*, 2016 WL 155279, at *9.

Bohlinger has not presented the requisite evidence to survive summary judgment. Bohlinger first invokes the 2015 specialization, arguing that his territory in 2017 dropped below the workload threshold only because his superiors in 2015 "designed [his] territory . . . to have a significantly lower workload than all his younger co-workers." (Dkt. No. 36 at 23.) Thus, Bohlinger argues, Abbott is "attempt[ing] to use the result of one of its discriminatory acts to obviate another." (*Id.*) This argument necessarily fails, however, because Bohlinger has not proved that the 2015 specialization and 2017 realignment are sufficiently related to constitute a single, ongoing act of discrimination. *See supra* Section III.A. Thus, the 2015 specialization — even under the dubious assumption that it was discriminatory[6] — would constitute a separate act of discrimination that cannot establish liability for otherwise unactionable 2017 conduct.

---

[5] Thus, the Court need not decide whether Bohlinger has made a *prima facie* showing of discrimination. *See, e.g.*, *Jaquez*, 2016 WL 155279, at *9 (proceeding "directly to the question of whether [the plaintiff] has put forward 'some evidence' of [pretext]").

[6] Because claims arising out of the 2015 specialization are time barred, the Court does not decide whether those claims would otherwise survive summary judgment.

Nor does Schultz's 2015 comment to Bohlinger about his retirement (SOF ¶ 56) raise an inference of age discrimination. As a general matter, questions about retirement do not raise an inference of discrimination absent other indicia of improper animus. "[A]n employer may make reasonable inquiries into the retirement plans of its employees and . . . a plaintiff should not be able to rely on those inquiries to prove intentional discrimination." *Hamilton v. Mount Sinai Hosp.*, 528 F. Supp. 2d 431, 447 (S.D.N.Y. 2007) (quoting *Montgomery v. John Deere & Co.*, 169 F.3d 556, 560 (8th Cir. 1999)). Further, Schultz's comment was both isolated and temporally remote from the 2017 realignment: the question about retirement was the "only age related comment" made to Bohlinger during his entire employment with Abbott (SOF ¶ 56), and Schultz had no hand in the 2017 decision to consider reassigning Bohlinger to a new territory (SOF ¶ 70). Thus, Schultz's "isolated" or "stray" comment, lacking a "demonstrable connection" to the 2017 realignment, is "insufficient to give rise to an inference of discrimination." *Bailey v. Frederick Goldman, Inc.*, No. 02-CV-2429, 2006 WL 738435, at *4 (S.D.N.Y. Mar. 23, 2006); *see also Hamilton*, 528 F. Supp. 2d at 447 (granting summary judgment because there was "no evidence that the decisionmakers involved in the terminations were the sources of or condoned any of the [age-related] comments").

Bohlinger also argues that "inconsistencies" and "shifting" explanations in the deposition testimonies of Brown and Siddiqui raise the inference of pretext. (Dkt. No. 36 at 23–24.) Bohlinger first points to Siddiqui's "consistent[] refus[al]," in his deposition testimony, to say whether Bohlinger's territory was viable in 2017. (Dkt. No. 36 at 23.) But Siddiqui's deposition testimony evinces only a hesitation about the precise words that were used: "the words viable, not viable territory, I don't recall those words, but, of course, we talked about low workload." (Dkt. No. 37-4 at 82:3–5.) And in that same deposition, Siddiqui unequivocally affirms that

8

Bohlinger's "low workload . . . meant that the current territory assignment couldn't continue." (Dkt. No. 37-4 at 113:16–18.) Thus, the record reveals no inconsistency on the issue of the territory's viability.

Bohlinger next points to an inconsistency between the deposition testimonies of Brown and Siddiqui. In his deposition, Siddiqui testified that he had not yet "made any decisions about what to do with Mr. Bohlinger's territory at the time [he] spoke with Mr. Brown in the summer of 2017." (Dkt. No. 37-4 at 84:10–13.) But according to Brown's deposition testimony, Siddiqui "informed[] [him] that Mr. Bohlinger's territory was going to be eliminated." (Dkt. No. 37-3 at 52:3–5.) Given this contradiction, Bohlinger argues that their testimonies "raise a host of questions about the veracity of [Abbott's] purported legitimate reason" for considering reassigning him. (Dkt. No. 36 at 24.) That conclusion does not follow. Although Brown and Siddiqui had different recollections about that particular aspect of their conversation, both are in fundamental agreement about the reason for the realignment. Brown testified that Bohlinger's "territory was no longer viable" because "the workload was too low" and that a solution would be to offer a reassignment to another "available territor[y] . . . closer to [Bohlinger's] home." (Dkt. No. 37-3 at 50:20, 51:3, 51:23–24.) Siddiqui concurred: Bohlinger's "territory assignment couldn't continue" because of "low workload," and the "solution" was to offer Bohlinger a reassignment to the "New Jersey territory where [he] lived." (Dkt. No. 37-4 at 113:16–24.) Thus, Brown and Siddiqui's depositions reveal "variations, if that, on the same theme rather than separate inconsistent justifications." *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 170 (2d Cir.

2001). And absent some material discrepancy between the two testimonies, Bohlinger has not established an "inconsistency suggesting pretext." *Id.*[7]

In short, Bohlinger's failure to submit any admissible evidence creating a genuine dispute as to pretext requires that the Court grant Abbott's motion for summary judgment.

## IV. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED.

The Clerk of Court is directed to close the motion at Docket Number 30 and to close this case.

SO ORDERED.

Dated: March 10, 2020
New York, New York

_____
J. PAUL OETKEN
United States District Judge

---

[7] Nor has Bohlinger offered any evidence that these explanations, "even if pretextual, served as pretext for age discrimination." *Roge*, 257 F.3d at 170 (quoting *Norville v. State Island Univ. Hosp.*, 196 F.3d 89, 98 (2d Cir. 1999)).